Giuseppe MARINO, Petitioner,

v.

IMMIGRATION & NATURALIZATION
SERVICE, UNITED STATES DEPART-
MENT OF JUSTICE, Respondent.

No. 714, Docket 75–4171.

United States Court of Appeals,
Second Circuit.

Argued Feb. 13, 1976.

Decided June 24, 1976.

Thomas A. Church, New York City, for petitioner.

Mary P. Maguire, Sp. Asst. U. S. Atty. (Thomas J. Cahill, U. S. Atty., S. D. N. Y., Thomas H. Belote, Sp. Asst. U. S. Atty., New York City, of counsel), for respondent.

Before TIMBERS, Circuit Judge, and BRYAN and HOLDEN, District Judges.*

FREDERICK van PELT BRYAN, District Judge:

Giuseppe Marino, a native and citizen of Italy admitted to this country as a non-immigrant visitor, petitions for review of a final order of deportation of the Board of Immigration Appeals pursuant to section 106(a) of the Immigration and Nationality Act (the "Act"), 8 U.S.C. § 1105a(a). The Board's order, entered on April 30, 1975,

* Frederick van Pelt Bryan, of the Southern District of New York, and James S. Holden, Chief Judge of the District of Vermont, sitting by designation.

dismissed an appeal from a decision of an immigration judge which denied Marino's application under section 245 of the Act, 8 U.S.C. § 1255, for adjustment of status to that of an alien lawfully admitted to the United States for permanent residence, found him deportable as an overstay visitor under section 241(a)(2) of the Act, 8 U.S.C. § 1251(a)(2), and granted him the privilege of voluntary departure by a specified date.[1]

Under section 245 of the Act, the status of an alien admitted to the United States as a non-immigrant visitor may be adjusted by the Attorney General, in his discretion, to that of an alien lawfully admitted for permanent residence. In order to be eligible for such relief, the alien must first be eligible to receive a visa and be admissible to the United States for permanent residence. An alien who has been convicted of a crime involving moral turpitude is generally ineligible to receive a visa and is excluded from admission under section 212(a)(9) of the Act, 8 U.S.C. § 1182(a)(9). He is thus ineligible for section 245 adjustment of status.

Marino was held ineligible for section 245 adjustment of status on the sole ground that he had been convicted of a crime involving moral turpitude in Italy prior to his entry into the United States.

In 1962, Marino was found guilty by a police magistrate in Ribera, Italy, of fraudulent destruction of his own property in violation of Article 642 of the Italian Penal Code. He appealed from the magistrate's decision to the Tribunal of Sciacca. Before his appeal was heard, however, the tribunal held that the crime ascribed to him had been extinguished by a presidential decree of amnesty issued subsequent to his conviction and deemed it unnecessary to proceed further in Marino's case for that reason. Thus, the merits of Marino's appeal were never heard or passed upon.

The question before us on this petition for review is whether, under these unusual circumstances, Marino has been convicted of a crime involving moral turpitude within the meaning of section 212(a)(9) of the Act, 8 U.S.C. § 1182(a)(9), and thus is excludable from admission to the United States and ineligible for adjustment of status under section 245.

I.

Marino is fifty years of age with a wife and children in Italy. He has three sisters who are citizens and residents of the United States, and another sister and a brother who reside here. On October 4, 1971 he was admitted to the United States as a non-immigrant visitor for pleasure, authorized to remain until November 3, 1971.[2] His temporary stay was extended until January 3, 1972. On February 14, 1972 the Immigration and Naturalization Service (INS) approved a visa petition filed by one of Marino's citizen sisters on his behalf which classified him as a fifth-preference alien for issuance of an immigrant visa. See section 203(a)(5) of the Act, 8 U.S.C. § 1153(a)(5).

Deportation proceedings were initiated against Marino by an order to show cause and notice of hearing dated May 22, 1972. At a hearing on May 31, 1972, Marino admitted his deportability as an overstay visitor, and was granted the privilege of voluntary departure under section 244(e) of the Act, 8 U.S.C. § 1254(e), with the proviso that if he failed to depart when and as required, he would be deported to Italy.

A July 11, 1972 motion by Marino to reopen the deportation proceedings in order to apply for adjustment of status pursuant to section 245 was granted on consent of the INS. On December 19, 1972, at a reopened hearing before an immigration judge, Marino's counsel presented his application for adjustment of status to that of an alien lawfully admitted for permanent

---

1. Deportation proceedings against Marino have been stayed by virtue of his pending petition for review. See section 106(a)(3) of the Act, 8 U.S.C. § 1105a(a)(3).

2. Apparently the non-immigrant visa on which Marino entered the United States was issued after he had received a waiver of inadmissibility resulting from his 1962 conviction. See section 212(d)(3) of the Act, 8 U.S.C. § 1182(d)(3).

residence. The only question raised was whether Marino was eligible for adjustment of status in view of his 1962 Italian conviction. Counsel for the INS represented that, under what he then considered the controlling authority of *Matter of T—,* 6 I. & N.Dec. 508 (1955), Marino's conviction was for a misdemeanor classifiable as a petty offense under section 212(a)(9) of the Act, 8 U.S.C. § 1182(a)(9), which did not make him ineligible for such status adjustment. The immigration judge, therefore, granted the application for adjustment of status but gave counsel for the INS

the option to reopen this hearing solely on notice, without permission from me, if something comes up with reference to this conviction which would lead him to believe [Marino] is not eligible for permanent resident status.

On January 30, 1973, the hearing was reopened on notice by counsel for the INS, in order to examine again the effect of the 1962 Italian conviction on Marino's eligibility for adjustment of status relief.

Certified copies and translations of (1) Article 642 of the Italian Penal Code, which Marino was charged with having violated; (2) the decision of the police magistrate of Ribera, finding him guilty; and (3) the declaration of the Tribunal of Sciacca that the crime had been extinguished by presidential amnesty and that further proceedings in his case were unnecessary for that reason, were received in evidence.

The decision of the police magistrate stated the charge against Marino and summarized the evidence. According to the decision, Marino, a tenant farmer, had reported to the police that fire had destroyed a farmhouse which he rented and a large number of beehives in the farmhouse which were his property, causing him damage covered by insurance. The magistrate found in substance that Marino had caused the fire and

had greatly exaggerated (if not made up out of whole cloth) the number of beehives destroyed, for the purpose of obtaining the insurance money. The magistrate found Marino guilty of fraudulent destruction of his own property in violation of Article 642 of the Italian Penal Code. He imposed a sentence of six months' imprisonment and a fine of 100,000 lire (approximately $160), suspended execution of the sentence for five years, and directed that Marino's name be omitted from mention in certificates as to the contents of the judicial files of the court. Marino appealed his conviction to the Tribunal of Sciacca.[3]

It appears from the declaration of the Tribunal of Sciacca in Marino's case that Presidential Decree of Amnesty of January 24th, 1963, No. 5 had been issued while his appeal was pending and undetermined. On March 8, 1963, on application of the Public Ministry, the appellate tribunal, without passing on the merits of Marino's appeal, found that the "crime ascribed to [him was] included among those foreseen" in the decree of amnesty and was therefore "extinguished". The court declared it

unnecessary to proceed in the matter of the aforesaid accused for the above-mentioned crime, by reason of the extinction of said crime following amnesty.

Thus, Marino's appeal was left undetermined and he was unable to obtain appellate review of the decision of the police magistrate.[4]

At the deportation hearing on January 30, 1973, Marino's counsel took the position that since Marino was completely deprived of his right to appeal from the Italian conviction against his will and intentions by the amnesty extinguishing the crime, the conviction was not of sufficient finality to render him "convicted" of a crime within the meaning of section 212(a)(9), 8 U.S.C. § 1182(a)(9). He urged that Marino was

---

**3.** The contention of INS that Marino appealed only the sentence imposed upon him and not the magistrate's determination of guilt is devoid of merit. The record makes it clear that Marino's appeal was from both the conviction and the rather minimal suspended sentence imposed.

**4.** An entry endorsed on the final magistrate's decision in Marino's case states: "Appeal not to proceed due to extinction of crime by reason of Amnesty."

not ineligible to receive a visa and excludable from admission to the United States under that section, and was therefore not ineligible for adjustment of status under section 245.

In support of this position, Marino's counsel offered to prove that Marino had made repeated efforts to prosecute his appeal from the 1962 judgment of conviction despite the amnesty, but had been barred from so doing by the declaration of the appellate tribunal that his crime had been extinguished by the amnesty and that it was thus unnecessary to proceed with the case further. Counsel for the INS conceded, on the record, that "an appeal was taken and was desired by [Marino], but was cut short by the amnesty which was granted."

Both the offer of proof by Marino's counsel and the concession by INS counsel with respect to Marino's desire and efforts to appeal were rejected by the immigration judge on the ground that any such proof would not "be material in making a judgment in this application for adjustment of status."

He also rejected the further contention that the crime for which Marino had been convicted was a misdemeanor classifiable as a petty offense which did not render Marino excludable from admission to the United States under section 212(a)(9) of the Act, 8 U.S.C. § 1182(a)(9), and thus ineligible for section 245 adjustment of status.

The immigration judge went on to hold that Marino had been convicted of a crime involving moral turpitude within the purview of section 212(a)(9) of the Act, 8 U.S.C. § 1182(a)(9); that he was therefore excludable from admission to the United States and ineligible for adjustment of status; and that his application for such relief was denied. Marino was found deportable as an overstay visitor and was again granted voluntary departure subject to deportation in the event that he failed to depart voluntarily as specified.

The Board of Immigration Appeals, in dismissing Marino's appeal, agreed with the decision of the immigration judge. This petition for review followed.

## II.

■ There are two distinct questions in a proceeding upon an alien's application for adjustment of status under section 245 of the Act. The first is whether the alien applicant is eligible for such relief; the second is whether such relief should be granted in the discretion of the Attorney General. *See Bagamasbad v. INS,* 531 F.2d 111 (3rd Cir., 1976) (en banc), *petition for cert. filed,* 44 U.S.L.W. 3671 (U.S. May 14, 1976).

■ Determination of an alien's eligibility for status adjustment involves questions of law and fact and is determined by specific statutory standards. *See Foti v. INS,* 375 U.S. 217, 228–29 n. 15, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963). It does not lie in the discretion of the Attorney General. A holding of ineligibility is subject to judicial review to determine whether or not the appropriate standards have been correctly applied. *Bagamasbad v. INS, supra,* at 118.

On this petition for review, Marino contends that it was error to hold that he was ineligible for adjustment of status. He makes substantially the same arguments he made during the administrative proceedings. He urges that since he was deprived against his will of his right to appeal from the decision of the Italian magistrate by the presidential amnesty, his conviction lacks the finality necessary to render him "convicted" of a crime within the meaning of section 212(a)(9) of the Act, 8 U.S.C. § 1182(a)(9). He also repeats his contention that the crime for which he was convicted was a misdemeanor classifiable as a petty offense under section 212(a)(9), 8 U.S.C. § 1182(a)(9), which did not render him ineligible for a visa and excludable from the United States.

Since we hold that, under the unusual circumstances here, the Italian conviction lacks the finality necessary to render Marino "convicted" of a crime within the meaning of the immigration laws, we do not reach or pass upon the contention that the crime for which he was convicted was only

a misdemeanor classifiable as a petty offense.

The declaration of the Tribunal of Sciacca applying the Presidential Decree of Amnesty of January 24, 1963, No. 5 affected Marino's 1962 conviction in two respects in Italy. In the first place, it "extinguished" the crime for which Marino had been convicted. Secondly, it precluded Marino from prosecuting his appeal from his conviction.

■ However, for purposes of the United States immigration laws, a foreign pardon, in itself, does not wipe out an alien's foreign conviction or relieve him from the disabilities which flow therefrom. *United States ex rel. Palermo v. Smith,* 17 F.2d 534, 535 (2d Cir. 1927); *Weedin v. Hempel,* 28 F.2d 603, 604 (9th Cir. 1928); *Mercer v. Lence,* 96 F.2d 122, 125 (10th Cir.), *cert. denied,* 305 U.S. 611, 59 S.Ct. 69, 83 L.Ed. 388 (1938); *United States ex rel. Consola v. Karnuth,* 108 F.2d 178, 179 (2d Cir. 1939); *Sohaiby v. Savoretti,* 195 F.2d 139, 140 (5th Cir. 1952).

■ Similarly, despite such differences as there may be between a pardon and an amnesty (see n. 8, *infra* ), foreign amnesties, like foreign pardons, do not obliterate a foreign conviction or remove, the disabilities which result from such a "conviction" for purposes of the Act, as several decisions of the Board of Immigration Appeals, with which we do not disagree, hold. *Matter of F– yG–,* 4 I. & N.Dec. 717 (1952); *Matter of B–,* 7 I. & N.Dec. 166 (1956); *Matter of Adamo,* 10 I. & N.Dec. 593 (1964).

■ Thus, the declaration of the tribunal applying the Italian amnesty, however effective in Italy, does not *ex proprio vigore* obliterate Marino's conviction for the purpose of determining his eligibility to receive a visa and meet the eligibility requirement for adjustment of status under section 245.

Nevertheless, the second effect of the declaration applying the amnesty—the deprivation of Marino's right to appeal from his conviction—is of marked significance in determining his eligibility to receive a visa and to meet the adjustment of status requirements.

■ Drastic consequences to the alien may result from a determination that he has been "convicted" of a crime within the meaning of the Act. *See Delgadillo v. Carmichael,* 332 U.S. 388, 391, 68 S.Ct. 10, 92 L.Ed. 17 (1947); *Costello v. INS,* 376 U.S. 120, 128, 84 S.Ct. 580, 11 L.Ed.2d 559 (1964). For this reason, specific rules of statutory interpretation have evolved in the immigration context. As Chief Judge Kaufman recently stated in *Lennon v. INS,* 527 F.2d 187, 193 (2d Cir. 1975),

[i]t is settled doctrine that deportation statutes must be construed in favor of the alien.

[S]ince the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used.

*See Fong Haw Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948); *Rosenberg v. Fleuti,* 374 U.S. 449, 459, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963); *Bonetti v. Rogers,* 356 U.S. 691, 699, 78 S.Ct. 976, 2 L.Ed.2d 1087 (1958).[5]

■ Consequently, an alien is not deemed to have been "convicted" of a crime under the Act until his conviction has attained a substantial degree of finality. *See Pino v. Landon,* 349 U.S. 901, 75 S.Ct. 576, 99 L.Ed. 1239 (1955) (per curiam), *rev'g, Pino v. Nicolls,* 215 F.2d 237 (1st Cir. 1954). Such finality does not occur unless and until direct appellate review of the conviction (as

---

**5.** This principle of construction is fully applicable in this case although we are focused specifically on the question of eligibility for adjustment of status rather than deportability.

Both exclusion from admission, which bars any adjustment of status, and deportation are triggered under the Act by the fact that an alien has been "convicted" of certain crimes.

*See, e. g.,* section 212(a)(9) and (10), 8 U.S.C. § 1182(a)(9), (10); section 241(a)(4) and (11), 8 U.S.C. § 1251(a)(4), (11). The term "convicted" has the same meaning whether exclusion or deportation is in issue. *See* 1 C. Gordon and H. Rosenfield, Immigration Law and Procedure § 2.43b, at 2–201 (rev. ed. 1975).

contrasted with collateral attack) has been exhausted or waived. *Will v. INS,* 447 F.2d 529, 532–33 (7th Cir. 1971); *Aguilera-Enriquez v. INS,* 516 F.2d 565, 570 (6th Cir. 1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 776, 46 L.Ed.2d 638, 44 U.S.L.W. 3397 (1976); 1 C. Gordon and H. Rosenfield, *supra,* § 4.12d, at 4–89 (Supp.1975).

While the authorities just cited deal with the finality requirement as applied to convictions of aliens in the United States, we see no good reason why the same standards of finality should not apply to foreign convictions if the Act is to be construed in accordance with the principles laid down in *Lennon v. INS, supra.* We find nothing in the Act which indicates a congressional intent to apply a standard of finality to foreign convictions different from that applied to domestic convictions.[6]

Thus, Marino could not have been "convicted" of a crime within the meaning of the Act until direct appellate review of his conviction was exhausted or waived.

Marino's right of direct appellate review of his conviction before the magistrate was neither exhausted nor waived. There was no exhaustion of direct appellate review since the appellate tribunal declared that, because of the amnesty, Marino's appeal could not be heard or decided. There was no waiver of direct appellate review because, as the administrative record makes clear, Marino attempted to pursue his appeal despite the amnesty and was precluded from so doing against his will.

This conclusion is buttressed by consideration of the nature and effect of an unsolicited amnesty.[7]

██ An unsolicited pardon or amnesty issued by the executive does not become effective automatically. It must be accepted by the one to whom it is issued before it

can operate as a waiver of his right to contest his guilt. *See United States v. Wilson,* 32 U.S. (7 Pet.) 150, 161, 8 L.Ed. 640 (1833); *United States v. Burdick,* 236 U.S. 79, 91, 35 S.Ct. 267, 59 L.Ed. 476 (1915); *Hoffa v. Saxbe,* 378 F.Supp. 1221, 1241–43 (D.D.C.1974).

In *Burdick,* the plaintiff in error had refused to testify before a grand jury, asserting his Fifth Amendment privilege against self-incrimination. President Wilson then issued a pardon to Burdick which would have had the effect of immunizing him from any criminal liability on the matters about which he was called upon to testify. He did not accept the pardon and still refused to testify. He then was held in contempt. Upon a writ of error, the Supreme Court reversed the conviction for contempt stating:

> Granting, then, that the pardon was legally issued and was sufficient for immunity, it was Burdick's right to refuse it, as we have seen, and it, therefore, not becoming effective, his right under the Constitution to decline to testify remained to be asserted. . . .

236 U.S. at 94, 35 S.Ct. at 270.

In rejecting the contention that "a pardon by its mere issue has automatic effect resistless by him to whom it is tendered," 236 U.S. at 90, 35 S.Ct. at 269, the Court stressed the dangers inherent in permitting automatic effects to flow from unsolicited executive clemency:

> Indeed, the grace of a pardon, though good its intention, may be only in pretense or seeming; in pretense, as having purpose not moving from the individual to whom it is offered; in seeming, as involving consequences of even greater disgrace than those from which it purports to relieve. Circumstances may be

---

6. *Contrast United States ex rel. Palermo v. Smith, supra,* which held that a foreign pardon was ineffective to obliterate a foreign conviction under the immigration act then in force, on the sole ground that the language of the act showed a congressional intent that a foreign pardon should not have the same nullifying effect on a foreign conviction of an alien as a domestic pardon had on a domestic conviction.

7. The amnesty here was not directed specifically to Marino but only generally to those convicted of certain categories of crimes. It is plain that Marino did not solicit the amnesty or have any part in bringing it about.

made to bring innocence under the penalties of the law. If so brought, escape by confession of guilt implied in the acceptance of a pardon may be rejected,—preferring to be the victim of the law rather than its acknowledged transgressor,—preferring death even to such certain infamy.

236 U.S. at 90–91, 35 S.Ct. at 269.

The *Burdick* court went on to discuss analogies and differences between pardon and amnesty. It said that while the statement in *Knote v. United States,* 95 U.S. 149, 152, 24 L.Ed. 442 (1877), that the distinction between amnesty and pardon "is one rather of philological interest than of legal importance" may be true as to their ultimate effect, "there are incidental differences of importance," 236 U.S. at 94; 35 S.Ct. at 271.[8] None of these incidental differences alters the proposition that the acceptance concept, a principle designed to protect the individual from unwanted consequences of a forced grant of clemency, applies both to an amnesty and a pardon.

In the case at bar we have a classic example of the serious consequences which would follow if an unsolicited amnesty automatically operated as a waiver by one to whom it is directed of the right to appeal from his conviction. If this were so, the very amnesty which was designed to relieve Marino of the stigma of his conviction would nail down as final a conviction which had not yet become final for purposes of the Immigration and Nationality Act. It would be impossible thereafter for Marino to cleanse himself of that stigma as far as the United States was concerned, no matter how meritorious his appeal might have been. Such a result would be unfair and unwarranted.

Here, the amnesty did not automatically operate as a waiver by Marino of his right to direct appellate review of his conviction, and there was no "acceptance" by him of the amnesty and its consequences which would constitute such a waiver.

 Thus Marino's right of direct appellate review of his conviction was never exhausted or waived and his conviction never became final so as to render him "convicted" of a crime involving moral turpitude within the meaning of the Act and ineligible for adjustment of status under section 245. The Board of Immigration Appeals and the immigration judge were in error in finding him ineligible for such adjustment on the sole ground that he had been convicted of a crime involving moral turpitude. On the record before us we hold that Marino is eligible for section 245 relief.[9]

The order for Marino's deportation and the denial of his application for adjustment of status to that of an alien lawfully admit-

---

8. The court described these as follows:

They are of different character and have different purposes. The one [amnesty] overlooks offense; the other [pardon] remits punishment. The first is usually addressed to crimes against the sovereignty of the state, to political offenses, forgiveness being deemed more expedient for the public welfare than prosecution and punishment. The second condones infractions of the peace of the state. Amnesty is usually general, addressed to classes or even communities,—a legislative act, or under legislation, constitutional or statutory,—the act of the supreme magistrate. There may or may not be distinct acts of acceptance. If other rights are dependent upon it and are asserted there is affirmative evidence of acceptance. . . . If there be no other rights, its only purpose is to stay the movement of the law. Its function is exercised when it overlooks the offense and the offender, leaving both in oblivion.

236 U.S. at 94–95, 35 S.Ct. at 270 (citations omitted).

9. The fact that Marino had overstayed his visit to the United States, and was thus deportable on a basis quite apart from his 1962 Italian conviction, is of no consequence, and the INS attempt to distinguish *Will v. INS, supra,* on this ground must fail. Marino was entitled to apply for adjustment of status to that of a permanent resident even though he had overstayed his visit. Indeed, one of the purposes of section 245 of the Act was to make it unnecessary for a visiting alien who had overstayed his visit to return to the country of his origin and reapply for a visa. If Marino's application for adjustment of status were granted in the Attorney General's discretion, his deportability for having overstayed his visit would be wiped out. See *Bagamasbad v. INS, supra.*

ted for permanent residence on the ground of ineligibility are vacated. The case is remanded for consideration of whether adjustment of status under section 245 should be granted in the discretion of the Attorney General.[10]

10. It should be borne in mind that, at the first adjustment of status hearing, when counsel for the INS mistakenly represented that Marino's conviction fell within the petty offense exception to excludability of section 212(a)(9) of the Act, 8 U.S.C. § 1182(a)(9), and that Marino was therefore eligible for status adjustment, the immigration judge found that discretion should be exercised in favor of adjustment. (*See* pp. 688–689, *supra.*)