72 F.3d 136
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
FUNDS TRANSFERRED FROM THE ACCOUNT of Maria ANAYA-HERRERA,
Matheson Trust Co. Limited, Jersey, Channel
Islands to Account # 13150-05612, Bank
of America, Concord California
ABA # 121000358, Defendant,
Aurelia Herrera-Rodriguez and Marina Anaya-Herrera,
Claimants-Appellants.
 
 No. 94-15986.
 United States Court of Appeals, Ninth Circuit.
 Submitted Dec. 5, 1995.*
Decided Dec. 12, 1995.
 Before PREGERSON, BRUNETTI and T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Claimants Marina Anaya-Herrera and Aurelia Herrera-Rodriguez appeal the district court's judgment after a jury trial in favor of the United States. The United States brought this action under 21 U.S.C. Sec. 881(a)(6) for the civil forfeiture of funds traceable to exchanges for controlled substances. We have jurisdiction under 28 U.S.C. Sec. 1291. We affirm.
 
 BACKGROUND
 
 3
 In October 1985, Barry Rosen deposited $250,000 in cash at the Matheson Trust Company ("MTC"), a trust and investment company located on the Island of Jersey in the British Channel Islands. A month later, Rosen and his business partner Victor Stadter, both United States citizens residing in Texas, appeared at MTC and arranged to form a company known as "Luftrenser Limited." The company was to be owned by a Channel Island trust of which Stadter and Rosen were the beneficiaries.
 
 
 4
 Records of the Luftrenser account show a large grouping of deposits during April and May 1986 via wire transfers from Irving Trust in New York, where MTC maintained an account to accept deposits in the United States. The deposits to the Luftrenser account came from approximately 362 cashiers checks or money orders, each of which were worth under $10,000. The amount deposited to Luftrenser from these checks totalled approximately $1,779,000. Following these deposits in 1986, there was no significant additional deposit activity to the Luftrenser account, and the balance increased primarily through investment and interest. The deposited funds remained in the account until April 1988.
 
 
 5
 On April 8, 1988 a woman using the name "Marina Anaya De Amarillas" (later identified as Marina Anaya-Herrera) and her mother ("claimants") appeared unannounced at MTC in the Channel Islands. MTC records indicate that Anaya stated she was a "family friend" of Vic Stadter and had been "sent by Vic Stadter." MTC officials telephoned Stadter, who instructed them to transfer $2,500,000 from his Luftrenser account to Anaya. Stadter told MTC that "Mr. Anaya" was a rancher in Mexico and that the transfer of funds represented payment for the purchase of approximately 3,000 tons of soybeans.[1] Pursuant to Stadter's instructions, MTC transferred approximately $2,500,000 from Luftrenser to an account in the name of Marina Anaya-Herrera (the "Anaya" account).[2]
 
 
 6
 For several months following the transfer of funds to Anaya, MTC sought unsuccessfully to contact her for instructions regarding the handling of the transferred funds. Finally, in June, 1989, MTC contacted Stadter, advising him of their difficulty in reaching Anaya. Stadter initially claimed to have no knowledge of Anaya's whereabouts. However, when advised of MTC's suspicions about the possibility of criminal or narcotic activity, Stadter told MTC he would contact Anaya and request that she contact MTC. On the same date, Anaya telefaxed written instructions to MTC directing it to maintain her funds in liquid accounts.
 
 
 7
 Later, in June, 1989, MTC wrote to Anaya requesting a more detailed explanation of information regarding the transaction leading to the transfer of funds to her account. Anaya responded four months later, stating that the funds "... were derived from the sale of land in Mexico, more specifically in the area of Culiacan."
 
 
 8
 Over a year later, on December 13, 1990, Anaya requested MTC to wire transfer $2,100,000 from her MTC account to an account at the Concord, California branch of the Bank of America. MTC complied with her request, and transferred the funds to the Bank of America. United States Customs officials, having been previously advised of the suspicious activity by the Jersey Police, sought a seizure warrant for the funds.
 
 
 9
 On December 17, 1990, United States Magistrate Judge Claudia Wilken authorized the issuance of a warrant for the seizure of the transferred funds. Pursuant to the warrant, Customs officials seized the funds, amounting to approximately $2,100,000 from the Bank of America on December 24, 1990.
 
 
 10
 After the United States filed the forfeiture complaint in the District Court, Anaya and Herrera-Rodriguez filed claims for the forfeited money based on an "innocent ownership" theory. They claim that Anaya's father gave them a large box of gold coins, which they exchanged at a local currency exchange in Juarez, Mexico. According to claimants, the currency exchange that they brought their gold coins to instructed them to go to Jersey to pick up their money at MTC.
 
 
 11
 On April 25, 1994, the case came on for trial in the district court. The jury returned a unanimous verdict in favor of the United States. During the trial, the judge admitted into evidence several exhibits from MTC's company files relating to the Luftrenser and Anaya accounts. Four MTC employees testified at the trial to establish the reliability and trustworthiness of the exhibits.
 
 
 12
 Exhibit No. 1 is a memorandum from the files of the Luftrenser account at MTC entitled "General Enquiry." It was prepared by Raymond Harvey, an MTC Director, and typed by his secretary, Alison Michaelson, on October 31, 1985. The subject of the memo is the appearance of Barry Rosen at MTC on October 29, 1985, with a briefcase containing $250,000 in currency.
 
 
 13
 Exhibit No. 2 is a file memorandum prepared by Harvey and typed by Michaelson on December 12, 1985. The subject of the memorandum was a meeting Harvey had with Victor Stadter and Barry Rosen on November 29, 1985. In that meeting, Stadter and Rosen requested the opening of the Luftrenser account, and Stadter indicated he would identify himself as "Box 100." The memorandum notes that MTC agreed to send Rosen monthly statements bearing no reference to the account name or number.
 
 
 14
 Exhibit No. 3 is a file memorandum from the Anaya account at MTC entitled "New General Enquiry" prepared by Harvey and typed by Michaelson on April 12, 1988. The subject of this memorandum is the initial unannounced visit of Anaya and her mother at MTC on April 8, 1988. The memorandum notes that MTC officials were told that "they had been sent by Vic Stadter the owner of Luftrenser." It also recites that MTC officials were told that Stadter authorized the transfer of approximately $2,500,000 from his Luftrenser account to Anaya, as payment for a crop of soybeans.
 
 
 15
 Exhibit No. 4 is a page of handwritten notes from the files of the Anaya account at MTC. The notes were from the original meeting that MTC officials Harvey and Kallman had with Anaya on April 8, 1988. The notes reflect that Anaya identified herself as a "family friend" of Victor Stadter.
 
 
 16
 Exhibit No. 13 is a file memorandum prepared by MTC Director Leslie Norman on June 23, 1989, relating to a telephone conversation on June 22, 1989 between Norman and Stadter. The memorandum indicates that Norman was told that Stadter paid the money to Anaya for payment of "equipment which he had purchased from them."
 
 ANALYSIS
 
 17
 A. The District Court Did Not Abuse Its Discretion When It Received MTC's Business Records Into Evidence
 
 
 18
 Exhibits 1, 2, 3, 4, and 13 were introduced at trial to call into question whether claimants were in fact innocent owners of the forfeited funds. These exhibits purported to establish a link between claimants and Vic Stadter, an individual with an extensive history of narcotics smuggling. These exhibits also undermined the credibility of claimants' testimony that their father/ex-husband gave them approximately $1.7 million in gold coins.
 
 
 19
 Claimants contend that Exhibits 1, 2, 3, 4 and 13 were improperly admitted into evidence at trial in contravention of Rule 803(6) of the Federal Rules of Evidence. This rule, known as the Business Records Exception, makes admissible certain business records that would otherwise be inadmissible under the Hearsay Rule. Rule 803(6) states, in relevant part:
 
 
 20
 (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, or acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.
 
 
 21
 We review a district court's evidentiary rulings during trial for an abuse of discretion. United States v. Manning, 56 F.3d 1188, 1196 (9th Cir.1995). We conclude that the district court properly admitted exhibits 1, 2, 3, 4 and 13 under Rule 803(6)'s business records exception to the hearsay rule. As the trial record indicates, these exhibits are routinely recorded memoranda of MTC's daily business operation and were maintained by MTC in its files. The United States authenticated the documents through the testimony of MTC employees Michaelson, Kallman and Norman. Because there is no evidence that casts doubt upon the trustworthiness of the documents, the United States established a sufficient foundation for their proper receipt at trial under Rule 803(6).
 
 
 22
 B. The District Court Properly Instructed the Jury
 
 
 23
 The claimants contend that the district court confused and misled the jurors by not giving the jury claimant's requested instruction which included a definition of probable cause. In its instructions to the jury, the district court stated:
 
 
 24
 The initial issue of probable cause having already been decided by the Court, the burden of proof shifts to claimants and they must now prove by a preponderance of the evidence that they are the actual owners of the seized funds and that they qualify as "innocent owners" of said funds. These are the only issues for you to consider in this trial.
 
 
 25
 In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation. United States v. Nordbrock, 38 F.3d 440, 445 (9th Cir.1994). We conclude that the district court's jury instructions did not mislead or confuse the jury. The District Court made reference to the issue of probable cause merely to inform the jury that the court had already decided the issue of probable cause and to focus the jury's attention on the only issue remaining in the case, whether claimants were "innocent owners" of the seized funds. This instruction was proper and in no way misleading to the jury.
 
 
 26
 AFFIRMED.
 
 
 
 *
 The panel unanimously found this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rule 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 According to the United States, an independent investigation revealed that the market price for 3,000 tons of soybeans at that time should have cost approximately $646,890
 
 
 [2]
 Marina Anaya Herrera had previously been married to Francisco Amarillas-Gastellum (from June 16, 1969 until their divorce on October 30, 1986). Amarillas had been the subject of numerous narcotics investigations by the United States Drug Enforcement Administration. (Supplemental Excerpt of Record at 42)